# No. 25-1555

*In the*

# UNITED STATES COURT OF APPEALS

*for the*

# FIRST CIRCUIT

JASON GRANT, ALLISON TAGGART,
LISA PETERSON, AND SAMANTHA LYONS,

*Plaintiffs-Appellants,*

v.

TRIAL COURT OF THE COMMONWEALTH OF
MASSACHUSETTS, BEVERLY J. CANNONE,
GEOFFREY NOBLE, MICHAEL D'ENTREMONT,
AND MICHAEL W. MORRISSEY,

*Defendants-Appellees.*

*On Appeal from the United States District Court
for the District of Massachusetts
No. 1:25-cv-10770-MJJ
The Honorable Myong J. Joun*

## APPELLANTS' OPENING BRIEF

Marc J. Randazza
Jay M. Wolman
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (888) 887-1776
ecf@randazza.com

Mark Trammell
CENTER FOR AMERICAN LIBERTY
P.O. Box 200942
Pittsburgh, PA 15251
Tel: (703) 687-6200
MTrammell@libertyCenter.org

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

STATEMENT IN SUPPORT OF ORAL ARGUMENT ............................................ 1

STATEMENT OF JURISDICTION ...................................................................... 2

STATEMENT OF ISSUES .................................................................................. 3

STATEMENT OF THE CASE ............................................................................. 4

    1.0   FACTUAL BACKGROUND ......................................................................... 4

    2.0   PROCEDURAL BACKGROUND .................................................................. 8

SUMMARY OF THE ARGUMENT ................................................................... 10

STANDARD OF REVIEW ................................................................................ 11

ARGUMENT ................................................................................................... 12

    1.0   THE MATTER IS NOT MOOT .................................................................. 12

    2.0   DUE PROCESS WAS DENIED .................................................................. 15

    3.0   APPELLANTS' FIRST AMENDMENT RIGHTS ARE VIOLATED .......................... 22

    4.0   APPELLANTS FACE IRREPARABLE HARM .................................................. 42

    5.0   THE BALANCE OF EQUITIES TIPS IN APPELLANTS' FAVOR ........................... 42

    6.0   INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST ........................................ 42

CONCLUSION ................................................................................................ 43

# TABLE OF AUTHORITIES

## CASES

*3137, LLC v. Town of Harwich,*
   126 F.4th 1 (1st Cir. 2025) ..................................................................... 28

*Akebia Therepeutics v. Azar,*
   976 F.3d 86 (1st Cir. 2020) ..................................................................... 12

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,*
   564 U.S. 721 (2011) ................................................................................ 32

*Ashcroft v. Am. Civil Liberties Union,*
   542 U.S. 656 (2004) ................................................................................ 32

*Bachellar v. Maryland,*
   397 U.S. 563 (1970) ................................................................................ 23

*Bronco Wine Co. v. Frank A. Logoluso Farms,*
   214 Cal. App. 3d 699 (1989) ................................................................... 16

*Brown v. American Nat. Bank,*
   197 F.2d 911 (10th Cir. 1952) ................................................................. 16

*Bruni v. City of Pittsburgh,*
   824 F.3d 353 (3d Cir. 2016) .................................................................... 34

*Casey v. City of Newport,*
   308 F.3d 106 (1st Cir. 2002) ....................................................... 10, 11, 36

*Chisholm v. Gilmer,*
   299 U.S. 99 (1936) .................................................................................. 16

*Chongris v. Board of Appeals of the Town of Andover,*
   811 F.2d 36 (1st Cir. 1987) ..................................................................... 28

*City of Chicago v. Morales,*
   527 U.S. 41 (1999) .................................................................................. 21

*Comm. v. Czerkawski,*
   Case No. NOCR2103-1094 (Norfolk. Sup. Ct. Mar. 16, 2018) .............. 14

*Comm. v. Lopes*,
  Case No. 1882CR00309 (Norfolk Sup. Ct. filed Jan. 31, 2023)..........................14

*Comm. v. Walsh*,
  Docket No. 2554CR000636 (Dedham Dist. Ct.) .............................................8, 28

*Commonwealth v. Read,*
  Case No. 2282CR0117 (Norfolk, Mass. Apr. 4, 2024)................................passim

*Cornelius v. NAACP*,
  473 U.S. 788 (1985) .........................................................................................40

*Cox v. Louisiana*,
  379 U.S. 599 (1965) .........................................................................................37

*Creative Env'ts, Inc. v. Estabrook*,
  680 F.2d 822 (1st Cir. 1982) ...........................................................................29

*Cruz v. Farquharson*,
  252 F.3d 530 (1st Cir. 2001) ...........................................................................13

*Cutting v. City of Portland*,
  2014 U.S. Dist. LEXIS 17481 (D. Me. Feb. 12, 2014)......................................42

*Demoulas v. Demoulas*,
  428 Mass. 555 (1998)........................................................................................16

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) .........................................................................................13

*Elrod v. Burns*,
  427 U.S. 347 (1976) .....................................................................................29, 42

*Firecross Ministries v. Municipality of Ponce*,
  204 F. Supp. 2d 244 (D. P.R. 2002) .................................................................42

*Gammoh v. City of La Habra*,
  395 F.3d 1114 (9th Cir. 2005)..........................................................................21

*Grant v. Trial Court*,
  137 F.4th 1 (1st Cir. 2025) .........................................................................10, 22

*Grieco v. Meachum*,
   533 F.2d 713 (1st Cir. 1976), *cert. denied*, 429 U.S. 858 (1976) ....................... 19

*Gulf of Me. Fishermen's Alliance v. Daley*,
   292 F.3d 84 (1st Cir. 2002) .................................................................. 13

*Hadfield v. McDonough*,
   407 F.3d 11 (1st Cir. 2005) .................................................................. 29

*Harris v. Univ. of Mass. Lowell*,
   43 F.4th 187 (1st Cir. 2022) ................................................................. 13

*Hodgkins ex rel. Hodgkins v. Peterson*,
   355 F.3d 1048 (7th Cir. 2004) ............................................................. 39

*Hussey v. City of Cambridge*,
   720 F. Supp. 3d 41 (D. Mass. 2024) .................................................. 23

*Int'l Shoe Co. v. State of Wash.*,
   326 U.S. 310 (1945) ............................................................................ 16

*Kev, Inc. v. Kitsap County*,
   793 F.2d 1053 (9th Cir. 1986) ............................................................. 21

*Kolender v. Lawson*,
   461 U.S. 352 (1983) ............................................................................ 21

*Lambert v. California*,
   355 U.S. at 225 (1957) ........................................................................ 16

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ............................................................................ 33

*Maine v. Moulton*,
   474 U.S. 159 (1985) ............................................................................ 19

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ............................................................................ 20

*McCullen v. Coakley*,
   573 U.S. 464 (2014) ..................................................................... passim

*Minn. Voters All. v. Mansky*,
   585 U.S. 1 (2018) ...................................................................41

*N.Y. v. Ferber*,
   458 U.S. 747 (1982) .................................................................37

*New York v. McMahon*,
   Civil Action No. 25-10601-MJJ, 2025 U.S. Dist. LEXIS 97722
   (D. Mass. May 22, 2025) .........................................................18

*O'Neill v. Baker*,
   210 F.3d 41 (1st Cir. 2000) .....................................................29

*Parratt v. Taylor*,
   451 U.S. 527420 (1981) ..........................................................29

*Perry Education Assn. v. Perry Local Educator's Assn.*,
   460 U.S. 37 (1983) ..................................................................40

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) .................................................................32

*Roe v. Wade*,
   410 U.S. 113 (1973) .................................................................13

*Seattle Mideast Awareness v. King Cty.*,
   781 F.3d 489 (9th Cir. 2015).....................................................23

*Shuttlesworth v. City of Birmingham*,
   394 U.S. 147 (1969) .................................................................32

*Spicuzza v. Commonwealth*,
   494 Mass. 1005 (2024)......................................................passim

*Steagald v. United States*,
   451 U.S. 204 (1981) .................................................................17

*Sullivan v. City of Augusta*,
   511 F.3d 16 (1st Cir. 2007) .....................................................41

*Terminello v. Chicago*,
   337 U.S. 1 (1949) ....................................................................23

*The Florida Star v. BJF,*
    491 U.S. 524 (1989) ........................................................................37

*The Republican Company v. Appeals Court,*
    442 Mass. 218 (2004) .....................................................................19

*Tucson Woman's Clinic v. Eden,*
    379 F.3d 531 (9th Cir. 2004) ..........................................................21

*Twining v. New Jersey,*
    211 U.S. 78 (1908) ..........................................................................16

*United States v. Brown,*
    2022 U.S. Dist. LEXIS 146271 (D.S.D. Aug. 12, 2022) .................18

*United States v. Grace,*
    461 U.S. 171 (1983) ........................................................................40

*United States v. Leahy,*
    473 F.3d 401 (1st Cir. 2007) ...........................................................31

*United States v. Tsarnaev,*
    Case No. 1:13-cr-10200-GAO (D. Mass.) ..................................38, 41

*United States v. United States District Court,*
    858 F.2d 534 (9th Cir. 1988) ..........................................................37

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ..................................................................passim

*Watchtower Bible & Tract Soc'y of N.Y., Inc v. Jesus,*
    634 F.3d 3 (1st Cir. 2011) ...............................................................40

*Weinstein v. Bradford,*
    423 U.S. 147 (1975) ........................................................................13

*Wilson v. Town of Mendon,*
    2002 U.S. App. LEXIS 4352 (1st Cir. Mar. 19, 2002) .....................17

**STATUTES**

28 U.S.C. § 1292 ...................................................................................2

La. Rev. Stat. § 14:401 (1962) ...........................................................37

Mass. Gen. Laws, ch. 266, §120 ...............................................................27

Mass. Gen. Laws, ch. 268, §13A .................................................24, 25, 26, 27

Mass. Gen. Laws, ch. 268, §13B...................................................24, 25, 26

Mass. Gen. Laws, ch. 268, §13C...................................................................40

Mass. Gen. Laws, ch. 272, §53 .................................................................25, 27

## OTHER AUTHORITIES

Flint McColgan, *Karen Read Case Judge Orders 200-foot 'Buffer Zone' During Trial*, Boston Herald (Apr. 4, 2024).......................................................5

Jeffrey C. Robbins, The Inherent and Supervisory Power, 54 GA. L. REV. 411, 422 (2020) ...............................................................................................18

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I .........................................................................passim

U.S. Const. amend. IV...........................................................................17

U.S. Const. amend. V ...........................................................................29

U.S. Const. amend. VI.......................................................................12, 38

U.S. Const. amend. XIV................................................................11, 16, 20

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

The Court heard argument in the prior appeal, and this appeal raises similarly.

significant constitutional issues, implicating both free speech and due process.

Whatever "inherent authority" may mean, a judge can still only act against a person

if jurisdiction attaches, and there was never any personal jurisdiction over

Appellants. Nor was it proper for the District Court to declare that certain statements

were impermissible irrespective of *mens rea*. These constitutional questions will

continue to arise as Massachusetts courts continue to enter "buffer zone" orders.

Oral argument will facilitate navigating the particular nuances.

## STATEMENT OF JURISDICTION

This appeal relates to an interlocutory order denying a request for injunctive relief. *See* 28 U.S.C. § 1292(a)(1) (granting jurisdiction). On May 28, 2025, the District Court denied, in part, Appellants' motion for preliminary injunction. ADD001. This Court has jurisdiction.

**STATEMENT OF ISSUES**

1.      Whether Massachusetts courts may enjoin non-parties to a proceeding without jurisdiction or due process.

2.      Whether buffer zone orders of the kind issued by Judge Cannone, even as supplemented, violate the First Amendment to the U.S. Constitution.

**STATEMENT OF THE CASE**

A Massachusetts Superior Court judge, presiding over a criminal case, issued an order enjoining Appellants and the general public from engaging in First Amendment-protected activities within 200-plus feet of the courthouse during the trial, in a "buffer zone" that includes sidewalks and public spaces that are traditional public forums. The injunction was issued against Appellants and the public without authority, without service of process, and without an opportunity to be heard. Appellants challenged that order and asked the District Court to enjoin it facially, and its as applied enforcement. A preliminary injunction was denied, and, on appeal, this Court reversed and remanded for further proceedings. After the state court judge supplemented the order, the District Court granted the preliminary injunction in part, but failed to remedy the jurisdictional, due process, and First Amendment violations. This appeal follows.

## 1.0 Factual Background

On January 29, 2022, John O'Keefe, a Boston Police Officer, died. AA003 at ¶ 13. On June 9, 2022, Karen Read was indicted for his murder. *Id.* at ¶ 14. Judge Beverly Cannone is presiding over *Commonwealth v. Read,* Case No. 2282CR00017 (hereinafter "*Read* Case"). AA004 at ¶ 15. The initial 2024 trial resulted in a mistrial ("first trial"). *Id.* at ¶ 17. A second trial began on April 1, 2025 ("second trial"). *Id.* at ¶ 18.

Prior to the first trial, the Commonwealth moved for a demonstration-free "buffer zone" beyond the grounds of the Norfolk Superior Courthouse. *Id.* at ¶ 19. Some citizens moved to intervene, against an injunction to be imposed against them, for the purpose of opposing the creation of a First Amendment-free zone. *Id.* at ¶ 20. Judge Cannone arbitrarily denied intervention, even though the sought-after injunctive order would directly affect the intervenors. *Id.* at ¶ 21; *see also Commonwealth v. Read,* Case No. 2282CR0017 (Norfolk, Mass. Apr. 4, 2024) and Flint McColgan, *Karen Read Case Judge Orders 200-foot 'Buffer Zone' During Trial*, Boston Herald (Apr. 4, 2024).[1] Judge Cannone then imposed the zone as requested by the Commonwealth. AA017.

Prior to the commencement of the second trial, the Commonwealth again moved for a buffer zone. This time, it requested that the zone's injunction encompass a larger area (comprising private property and traditional public forums, including public sidewalks and other areas). AA005 at ¶ 24. The Commonwealth's rationale for requesting this new, expanded buffer zone was that the demonstrators outside could be heard in the courthouse. AA027. The Commonwealth additionally complained that, during the first trial, trial participants and jurors could hear "passenger and commercial vehicles … honk[ing] their horns as a form of

---

[1] Available at <https://www.bostonherald.com/2024/04/04/judge-approves-smaller-buffer-zone-around-karen-read-trial/>

demonstration." *Id.* Incredulously, the jurors could not deliberate if forced to endure the sounds of ordinary traffic noise.

True to her established practice, Judge Cannone decreed the zone in existence, issuing her buffer-zone injunction against the public, including Appellants, on March 25, 2025. She provided no opportunity for affected persons enjoined by her order to intervene nor be heard. AA017. She decreed that a larger buffer zone for the second trial was warranted, and expressly ordered that:

> *no individual may demonstrate in any manner, including carrying signs or placards, within 200 feet of the courthouse complex during trial of this case, unless otherwise ordered by this Court. This complex includes the Norfolk Superior courthouse building and the parking area behind the Norfolk County Registry of Deeds building. The buffer zone shall further be extended to include the area bounded by Bates Court, Bullard Street, Ames Street, and Court Street. Individuals are also prohibited from using audio enhancing devices while protesting.*

AA005 at ¶ 25; AA034 ("Second Prior Restraint Order").



Since November 2024, Appellants Jason Grant, Allison Taggart, Lisa Peterson, and Samantha Lyons regularly peacefully protested near the courthouse, holding signs criticizing Judge Cannone. AA006 at ¶ 26. Their demonstrations took place within the buffer zone. *Id.* at ¶ 27. Plaintiff Jason Grant peacefully demonstrated on the sidewalk next to the courthouse holding signs reading "Judge Bev is Conflicted" and "Bev's Court is a Clownshow" with images of D.A. Morrissey and Judge Cannone. *Id.* at ¶ 28. Their demonstrations were about Judge Cannone and occurred during trials taking place in the courthouse. *Id.* at ¶ 29. There were no adverse incidents, and no trials were disturbed, including Ms. Read's. *Id.* at ¶ 30. There is no record of anyone even complaining, much less justifiably complaining.

Appellants desired to continue to demonstrate, including criticizing Judge Cannone, off the grounds of the courthouse complex but within the buffer zone. AA007 at ¶ 31. However, they reasonably feared contempt proceedings, arrest, and prosecution by Appellees (Judge Cannone, the state police, and the DA). *Id.* at ¶¶ 32-35. The Massachusetts State Police used the Zone decree to not only shut down protest, but to harass, threaten, **and violently injure** journalists and everyday citizens simply trying to walk in the area. (ADD005) (journalists & citizen). In fact, one citizen, Erica Walsh, was repeatedly harassed by Massachusetts State Police for

wearing a sweatshirt that read "Criminals Control Norfolk County" and she was even arrested for it.[2]  (ADD006-ADD007).

Although the *Read* trial ended on June 19, buffer zone orders were not unique to this case.  Appellants' fears have not abated.

## 2.0    Procedural Background

Appellants sued on April 1, 2025.  AA001.  That same day, they sought a temporary restraining order and a preliminary injunction to enjoin the order facially and its enforcement as applied.  AA035-AA057.  Further evidence was filed the next day.  AA060-075.  The Commonwealth Appellees opposed on April 4.  AA076-AA154.  Appellants filed supplemental authority that day as well.  AA155.  A non-evidentiary hearing on the motion was held on April 4.  AA175-AA176.

The District Court requested additional briefing, filed on April 10.  AA177-AA201.  Appellants provided additional evidence and requested judicial notice on April 11, 2025.  AA202.  The motion for the TRO and preliminary injunction was

---

[2] The charges stemming from the arrest were dismissed for lack of probable cause. *Comm. v. Walsh*, Docket No. 2554CR000636 (Dedham Dist. Ct.). The state police also sought separate charges from another instance of wearing the same shirt, but the clerk-magistrate denied the application for lack of probable cause.  *Id.*  Appellees should have dismissed these proceedings promptly after the District Court's injunction issued, but they did not do so.

denied on April 11.[3]  ADD001.

Appeal was filed (Case No. 25-1380). ADD012. Appellants sought an injunction pending appeal on April 17.  AA217-AA227.  It was denied. AA228.

On May 9, a panel of this Court vacated the denial and remanded "for further proceedings to determine how the [buffer zone] Order has been interpreted and applied and whether the lack of a mens rea requirement renders the Order insufficiently tailored." (AA267, AA269, AA495).  The District Court, thereupon, held a status conference on May 12 (AA320),[4] and the District Court took no action but required the parties to report back on May 19, which they did (AA338 & AA339).  This included Judge Cannone's May 15, Supplemental Order (AA336).  A further status conference was held on May 20 (AA346), and the parties filed supplemental memoranda thereafter regarding how the buffer zone orders were enforced, including how the purported review procedure under the supplemental order operated.  (AA353, AA390, & AA405).  Certain amici filed a brief in support of Appellants (AA431) and a further hearing on the motion was held on May 22 (AA459).

---

[3] The order was initially unclear as to whether it denied only a TRO or both the TRO and the preliminary injunction; the District Court thereupon clarified that the Order denied both. AA216.

[4] In advance of the status conference, Appellants provided the District Court with a proposed order, Jane Roe's appellate brief, and the declaration of Erica Walsh. (AA270, AA307, & AA312).

On May 28, Judge Joun entered his order granting the preliminary injunction in part and denying it in part. (ADD001). This appeal follows (ADD021). In the meantime, Appellants sought an injunction pending appeal, which was denied for the reasons given in the prior order. (AA496, AA501, & AA513).

## SUMMARY OF THE ARGUMENT

The Commonwealth of Massachusetts, while trying to convict Karen Read of murder, sought a "buffer zone" where protest would be prohibited. The claimed rationale the government presented when requesting this buffer zone, which Ms. Read did not join, was to protect Karen Read's right to a fair trial. In other words, the *government* sought to suppress anti-government protests with the excuse that it was to protect the accused. No reasonable person would take this at face value.

The buffer zone injunction prohibits "demonstrations," which is a content-based restriction. Strict scrutiny renders it unconstitutional, but it fails under the intermediate-scrutiny standard previously used by the Court. *Grant v. Trial Court*, 137 F.4th 1, 5 (1st Cir. 2025). Judge Cannone was required to consider whether the buffer zone "sweeps more broadly than necessary to promote the government's interest." *Casey v. City of Newport*, 308 F.3d 106, 114 (1st Cir. 2002). A court cannot make this determination "without some evaluation [in the record] of the alternative measures put in issue by the parties." *Id.* Finally, any restriction chosen by the court "cannot be 'substantially broader than necessary to achieve the government's

interest.'" *Id*., quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989). The restriction, even as supplemented, was overbroad. The *mens rea* purported required was ephemeral.

In addition to violating the First Amendment, the buffer zone injunction violated the Fourteenth Amendment. The Fourteenth Amendment's Due Process Clause prevents the government from "depriv[ing] any person of . . . liberty . . . without due process of law." U.S. Const. amend. XIV, § 1. But due process cannot exist when a government official, a judge with a duty to uphold the federal and Massachusetts Constitutions, simply decrees a vague, Constitution-free zone, with no jurisdiction over non-parties. Judge Cannone's order was issued without jurisdiction, authority, or opportunity for hearing, utterly failing the due process requirement. Although the *Read* trial is over, this was not the first case with a buffer zone nor will it be the last. This Court needs to restore Constitutional order now that the dust has settled over Dedham, before the rot that has set in spreads. At this point, trial court judges are under the impression that they are permitted to simply suspend the Constitution, without due process, without any reasonable restrictions, just because they say so. That is not how this Republic functions.

## STANDARD OF REVIEW

Denials of injunctions are reviewed for abuse of discretion, though the Court of Appeals reviews "answers to legal questions *de novo*, factual findings for clear

error, and judgment calls with some deference to the District Court's exercise of discretion." *Akebia Therepeutics v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020).

## ARGUMENT

The government finds protest inconvenient, and Judge Cannone and the Norfolk County DA chafed at protests that criticized them. The Sixth Amendment did not need this buffer zone – it was summoned as a pretext to dishonestly throttle its sister – the First Amendment.

Judge Cannone had neither power nor jurisdiction over nonparties outside the Courthouse. She has dominion over her courtroom. She may have authority over the entire courthouse. She may even be able to dictate what happens on the courthouse steps and the lawn outside. But she does not have power over anything beyond that. She does not have inherent dominion over the public sidewalks across the street, down the street, or anywhere else that is not actually courthouse property. And she does not have jurisdiction over non-parties and those otherwise outside her jurisdiction. "The First Amendment has no power here" zone casted its shadow over public sidewalks, private property, and even the public library.

## 1.0    The Matter is Not Moot

Appellees will, undoubtedly, argue that because the *Read* trial is over and the Buffer Zone Order expired by its own terms, the underlying case, and this appeal, are moot. However, this is a quintessential "capable-of-repetition" issue, which

avoids mootness upon a showing "that '(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.'" *Gulf of Me. Fishermen's Alliance v. Daley*, 292 F.3d 84, 89 (1st Cir. 2002) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (per curiam)).

The first prong is easily met. To satisfy this prong, an appellant "must show that 'the generic types of claims that they seek to pursue are likely to evade review.'" *Harris v. Univ. of Mass. Lowell*, 43 F.4th 187, 194 (1st Cir. 2022) (quoting *Cruz v. Farquharson*, 252 F.3d 530, 535 (1st Cir. 2001)). The *Read* prosecution lasted for two and a half months. Many trials last but a few days—the George Zimmerman/Trayvon Martin trial lasted 19 calendar days and the Derek Chauvin/George Floyd trial lasted 22 calendar days. By the time a demonstrator may learn of an order (which could issue the day before the trial), file an emergency preliminary injunction motion, lose, and have an expedited appeal adjudicated, the trial may be over and the opportunity to demonstrate forever lost. This case is a prime example—Appellants did not even obtain partial relief until 8 weeks after filing their case.

As the Supreme Court once observed, even 266 days does not afford the appellate process to play out. *Roe v. Wade*, 410 U.S. 113, 125 (1973) *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).

Few trials last 266 days.  Even the lengthy O.J. Simpson trial lasted but 252 days. Thus, this is the type of claim that will most certainly evade review.

The second prong is also met—Appellants are likely to find themselves subjected to these same types of buffer zone orders.  The *Read* prosecution does not stand alone.  Appellants are aware of three other times such orders were sought in Massachusetts, including a prior grant:

1. In the animal-cruelty prosecution of Radoslaw Czerkawski, Judge Cannone entered a 500-foot buffer zone, barring all forms of demonstration.  *Comm. v. Czerkawski*, Case No. NOCR2103-1094 (Norfolk. Sup. Ct. Mar. 16, 2018).  Notably, Judge Cannone's order was merely a repetition of Judge Kenneth Fishman's prior identical order in that case when trial was anticipated to be sooner.  *Comm. v. Czerkawski*, Case No. NOCR2103-1094 (Norfolk. Sup. Ct. Oct. 17, 2017).  No potential demonstrator had notice or an opportunity to be heard on either occasion.

2. In the prosecution of Emanuel Lopes for the killings of Weymouth Police Officer Sgt. Michael Chesna and resident Vera Adams, the defense sought a 500-foot buffer zone prohibiting all statements supporting or against any victim or the defendant.  *Comm. v. Lopes*, Case No. 1882CR00309 (Norfolk Sup. Ct. filed Jan. 31, 2023).  For

unknown reasons, that motion was not adjudicated, but no one who would have been affected had notice or an opportunity to be heard.

3. The defense in the prosecution of Boston Marathon bomber Dzokhar Tsarnaev sought a 35-foot buffer zone against all demonstrations regarding the merits of the case. Although Judge O'Toole denied the motion, no one who would have been affected had notice or an opportunity to be heard. AA202, *United States v. Tsarnaev*, Case No. 1:13-cr-10200-GAO (D. Mass. Dec. 30, 2015).

With Judge Cannone having twice entered such orders, and with this case having brought even greater visibility to such orders, it likely they will be sought and entered by judges throughout Massachusetts. The Buffer Zone now seems to be part of the Commonwealth's *modus operandi*; it was even considered for a trial of Aidan Kearney a/k/a Turtleboy, the reporter who drew national attention to the *Read* case. *See* AA500 at ¶ 6. It seems these orders will become universal and permanent—we will have extraordinary violations of the First Amendment everywhere. Such will be in derogation of the rights of Appellants and the citizens of Massachusetts. Thus, this case, and this appeal, is not barred by mootness.

## 2.0 Due Process was Denied

In the first appeal, Appellants raised a significant due process question—the buffer zone order was an injunction entered against them in the absence of

jurisdiction and without notice or opportunity to be heard. The Court, in vacating the denial of Appellants' motion on First Amendment grounds, did not reach the due process question. It should do so now.

The buffer zone orders were issued *ex parte*, without jurisdiction over Appellants. The Fourteenth Amendment holds that "No state shall . . . deprive any person of life, liberty, or property, without due process of law. . . ." The right to due process is fundamental and inalienable.

Due process requires a court to have general or specific jurisdiction over a person to avoid "offend[ing] traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 316 (1945) (citations omitted). Similarly, jurisdiction typically does not attach until service of a writ or other process. *Chisholm v. Gilmer*, 299 U.S. 99, 102-103 (1936). As this Court observed:

> a federal court will not impose judgment on a party that is not offered the opportunity to defend itself. *Lambert*, 355 U.S. at 228. The idea that process is not only due but must be duly provided is so "universally prescribed in all systems of law established by civilized countries," *Twining v. New Jersey*, 211 U.S. 78, 111 (1908), that courts have only seldom to remind litigants that such is the case. *See, e.g., Brown v. American Nat. Bank*, 197 F.2d 911, 914 (10th Cir. 1952) ("It is a familiar rule of frequent enunciation that judgment may not be entered with binding effect against one not actually or constructively before the court."); *Bronco Wine Co. v. Frank A. Logoluso Farms*, 214 Cal. App. 3d 699, 717 (1989) ("Rendering a judgment for or against a nonparty to a lawsuit may constitute denial of due process under the United States and California Constitutions. . . . Notice and a chance to be heard are essential components to the trial court's jurisdiction and for due process. Without jurisdiction over the parties, an *in personam* judgment is invalid."); *Demoulas v. Demoulas*, 428 Mass. 555, 591 (1998) ("The

judge did not have jurisdiction over nonparties, and we cannot make awards in favor of nonparties. .").

*Wilson v. Town of Mendon*, 2002 U.S. App. LEXIS 4352, *17-19 (1st Cir. Mar. 19, 2002). A judge has jurisdiction over her own courtroom and, likely, courthouse property. But these buffer zone orders cover public and private property, including traditional public forums, for acres beyond the courthouse steps, without jurisdiction.

Here, Appellants were never brought within Judge Cannone's jurisdiction, and her orders should not bind them. To suggest otherwise would mean that Judge Cannone's order is a general warrant that leaves "to the discretion of the executing officials the decision as to which persons should be arrested[,]" an affront to the Fourth Amendment. *Steagald v. United States*, 451 U.S. 204, 220 (1981). Does the District Court have jurisdiction over nonparties posting signs in the windows of the Envoy Hotel, or over protesters on Seaport Boulevard? If so, how is that jurisdiction acquired? Obviously, it does not, and neither do state court judges.

Judge Cannone claimed she was protecting Ms. Read's right to a fair trial, but the Constitution constrains her abilities to those persons and places under her jurisdiction. She could soundproof the courthouse, not erect a barrier two blocks down. Perhaps if a government authority *with the authority* over the public sidewalks created a regulation promoting this interest, it *might* meet the relevant level of scrutiny if it had the proper *mens rea* and proper narrow tailoring. The Town

of Dedham, for example, can lawfully require parade permits. A Court has no power to control non-party use of public forums (sidewalks) else such orders would have been commonplace for centuries.

The District Court determined that Judge Cannone has the "inherent authority" to do anything to anyone so long as it "protect[s] the fairness and integrity of the judicial process and ensuring fair procedure for all parties." (ADD010 at n. 5). "These actions are plainly beyond the bounds of what Defendants can do, and Defendants do not point to any authority to the contrary." *New York v. McMahon,* Civil Action No. 25-10601-MJJ, 2025 U.S. Dist. LEXIS 97722, at *85-86 (D. Mass. May 22, 2025) (Joun, U.S.D.J.). The term "inherent authority" does not grant a trial court judge dictatorial powers to do whatever she wants, whenever she wants. Even if she had the "inherent authority" to legislate the streets of Dedham, she lacked the jurisdiction and the District Court failed to properly address the issue. Inherent authority is circumscribed by jurisdiction, to wit, it is

> the power possessed by a court simply because it is a court; it is [ ] authority that inheres in the very nature of a judicial body and requires no grant of power other than that which creates the court and gives it jurisdiction. This power is often described as 'supervisory power' over the parties and actors within the jurisdiction of a particular court

*United States v. Brown*, 2022 U.S. Dist. LEXIS 146271, at *1 (D.S.D. Aug. 12, 2022) (quoting Jeffrey C. Robbins, The Inherent and Supervisory Power, 54 GA. L. REV. 411, 422 (2020)). That is, since she lacked jurisdiction over Appellants, then

the trial court judge has no inherent authority to enjoin or otherwise control their actions or speech.

Additionally, no procedures were in place to contest the order. There was no meaningful opportunity to be heard—it was issued on an *ex parte* basis. *Ex parte* communications can "shadow the impartiality, or at least the appearance of impartiality," of a proceeding and "may, in some circumstances, constitute a deprivation of due process of law." *Grieco v. Meachum*, 533 F.2d 713, 719 (1st Cir. 1976), *cert. denied*, 429 U.S. 858 (1976), *overruled on other grounds by Maine v. Moulton*, 474 U.S. 159 (1985). Here, Judge Cannone only heard from the Commonwealth and gave no opportunity to any potential subject of the order to be heard. In fact, history shows she flatly denies intervention to be heard to those who would be affected. *See Comm v. Read,* Case No. 2282CR0117 (Norfolk, Mass. Apr. 4, 2024). And state law bars intervention in criminal cases. *The Republican Company v. Appeals Court,* 442 Mass. 218, 227 n. 14 (2004) (intervention is "a concept foreign to criminal procedure.") In the *Spicuzza* case, the SJC determined that allowing intervention was not something they would consider. *Spicuzza v. Commonwealth*, 494 Mass. 1005, 1007 (2024). The District Court erred when it mind-bogglingly determined that Judge Cannone's hearing on the motion, where only the Commonwealth was allowed to participate, was sufficient because she marked as an exhibit an unsolicited email from some businesses. ADD009-

ADD010. That is not what is meant by an opportunity to be heard, and that error alone showed such a languid commitment to due process that this Court must correct it.

"[T]he specific dictates of due process generally require[] consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); Judge Cannone did not provide notice to any of the Appellants regarding her intent to hold a hearing on (a) whether she had jurisdiction over non-parties, (b) whether she had the power to impose a Buffer Zone, and (c) whether Appellants' First Amendment rights precluded such imposition. Instead, she slammed the courthouse door on anyone who wanted to intervene, taking the word of the Commonwealth, with no adversarial proceeding, and used the hearsay pretext of her hand-selected jury foreman's claims that there was "noise," warranting a wholesale disregard of the First and Fourteenth Amendments.

The order's vagueness further evidences a deprivation of due process. The order, like any regulation, must define the offense with sufficient definiteness so

ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). A great degree of specificity and clarity of such notice and restriction is required when First Amendment rights are at stake. *Gammoh v. City of La Habra*, 395 F.3d 1114, 1119 (9th Cir. 2005); *Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1057 (9th Cir. 1986). A regulation is vague if it either fails to place people on notice of exactly which conduct is prohibited, or if the possibility for arbitrary enforcement is present. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). Here, there was not even a regulation allegedly violated.

The Order is a vague, unconstitutional regulation. Government regulations which rely on a viewer's subjective interpretation of facts are void for vagueness. *Morales*, 527 U.S. at 56-64 (holding a provision criminalizing loitering, which is defined as "to remain in any one place with no apparent purpose," void for vagueness because the provision was "inherently subjective because its application depends on whether some purpose is 'apparent' to the officer on the scene"); *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 554-55 (9th Cir. 2004) (holding a statute requiring physicians to treat patients "with consideration, respect, and full recognition of the patient's dignity and individuality" void for vagueness because it "subjected physicians to sanctions based not on their own objective behavior, but on the subjective viewpoint of others"). The District Court determined it was not vague

because an Appellant would know where and when they can demonstrate. ADD010. In the May 28 Order, the District Court attempted to address the issue of what could and could not be said, but it only made it worse. A hat, facing away from the courthouse, with the letters "FKR" approximately 1 inch high, that no juror abiding her instructions would possibly understand nor see was deemed prohibited by the District Court, even though the buffer zone orders were utterly silent on it.

If a judge does not want to hear that her court is a "clownshow," that is her problem, not that of a citizen across the street. A vague order, issued without notice or opportunity to be heard, in the absence of jurisdiction is a trifecta of due process abuses and raises the thought that perhaps the shoe fits, if that is the kind of process taking place there. These types of judicial overreach cannot be condoned and buffer zones outside courthouse property must be enjoined in their entirety.

## 3.0   Appellants' First Amendment Rights are Violated

The Court previously recognized that First Amendment interests were at stake and, at a minimum, it "must determine whether the Order is narrowly tailored to effectuate the Commonwealth's asserted interests." 137 F.4th at 5. It observed that the original buffer zone orders lacked a *mens rea* requirement where Appellants were only seeking to engage in quiet,[5] offsite areas, not interfering with or influencing

---

[5] The government has argued that there should be no silently holding signs because the mere act of silent protest encourages vehicles to honk their horns in support of,

trial participants, or interfering with the administration of justice.  *Id.* at 5-6.  The Court also invited (but didn't order) Judge Cannone to amend her orders to allow such quiet, offsite, nonobstructive demonstrations.  However, even though an amendment was made, it was insufficient and these buffer zone orders are not constitutionally salvageable.

The District Court abandoned its fact finding role as to whether the government's interest in *this* case and whether *these* buffer zone orders were narrowly tailored.  Rather than considering whether 200 feet was too expansive, the District Court deferred to the purported findings Judge Cannone made (while considering whether to ban protest that mocked her).  (ADD013).  That was error. Appellees should have presented the original affiants for examination.  This District Court improperly viewed itself more as a court of appeals, deferring to Judge Cannone's findings, rather than make independent findings.  The District Court is a

---

or in opposition to, those signs.  "Heckler's vetoes," which occur when speech is curtailed to prevent public disorder, are "impermissible justifications for the restriction of speech." *Hussey v. City of Cambridge*, 720 F. Supp. 3d 41, 58 n.15 (D. Mass. 2024), *citing Bachellar v. Maryland*, 397 U.S. 563, 567 (1970). An unconstitutional "heckler's veto" exists when the government allows or disallows protected speech based merely on the audience's reaction to its content. *See Bachellar*, 397 U.S. at 567. Granting a heckler's veto is an impermissible and unconstitutional content-based and viewpoint-based restriction. *See Terminello v. Chicago*, 337 U.S. 1 (1949); *Seattle Mideast Awareness v. King Cty.*, 781 F.3d 489, 502-03 (9th Cir. 2015).

court of first instance. Moreover, by deferring to Judge Cannone, the District Court only compounded the due process problem—Judge Cannone's findings should not be entitled to deference where Appellants lacked any opportunity to be heard before her. They were unable to present the evidence of the juror who said the noise was not a problem. They were unable to confront the hearsay statements of the other juror and Officer Hardman and cross-examine them as to specific assertions. Notably, the 200 foot boundary was established because of purported noise concerns—Judge Cannone gave no consideration for quiet protest. It was the duty of the District Court to evaluate in the first instance whether there was evidence justifying a 200 feet restriction on speech and the District Court relied on no admissible evidence

Nor did the Court given any attention to *McCullen v. Coakley*, in which the very fact of a "fixed buffer zone[]" was deemed "truly exceptional" and it "raise[d] concern that the Commonwealth has too readily forgone options that could serve its interests just as well, without substantially burdening the kind of speech in which petitioners wish to engage." 573 U.S. 464, 490 (2014). Judge Cannone had other options—she could simply allow enforcement of Mass. Gen. Laws, ch. 268, §§ 13A & 13B in the usual course. The Karen Read trial was not exceptional. All high-profile trials attract demonstrators—whether the trials of the eight soldiers accused

of perpetrating the Boston Massacre, or those of individuals like O.J. Simpson, George Zimmerman, or Derek Chauvin.

Any regulation to protect the right to a fair trial need only be in the form of enforcing existing laws – like M.G.L. c. 268 § 13B, which makes it a crime to willfully, either directly or indirectly, engage in acts intended to interfere with or retaliate against participants in criminal or civil proceedings. These participants include witnesses, potential witnesses, jurors, judges, attorneys, law enforcement officers, court officials, or their family members. Or M.G.L. c. 268, § 13A, which was identified by the Commonwealth as supporting order. Such covers every last concern the Commonwealth could legitimately have. M.G.L. c. 272, § 53, the disorderly conduct statute, would fill in any cracks that could be imagined.

A review of the Supplemental Order, which purported to address this Court's concerns, shows why these orders are not constitutionally salvageable. On May 15, 2025, Judge Cannone issued a "Supplemental Order Regarding the Buffer Zone" (AA336). She refused to vacate the prior orders. The Supplemental Order, instead, did as follows:

1. Maintained in place prior orders vis a vis Courthouse property.

2. Maintained in place prior orders as to pathways, including sidewalks and roads, through which trial participants enter and exit the courthouse. (To the extent it restricts speech on traditional public

forums and is not merely about ensuring unimpeded access, Plaintiffs contest this provision, but would not have had this provision comported with *McCullen v. Coakley* – and simply provided that trial participants could not be impeded nor interfered with by any demonstrators. That is all the Constitution allows.)

3. Prohibited noisy protests intended to interfere with the administration of justice or influence any judge, juror, witness, or court offer in the discharge of duties within the buffer zone. (If this were merely enforcement of existing noise ordinances or G.L. c. 268, §§ 13A & 13B, Plaintiffs would not contest it, but it the Massachusetts State Police did not abide.)

4. Prohibited display of written or graphic materials intended to interfere with the administration of justice or influence any judge, juror, witness, or court offer in the discharge of duties within the buffer zone. (This is simply G.L. c. 268, §§ 13A & 13B. If this were merely enforcement of G.L. c. 268, §§ 13A & 13B, Plaintiffs would not contest it, but the Massachusetts State Police did not abide it.)

5. Established a post-deprivation procedure for "review" of restrictions of activity by law enforcement, which did not provide for immediate, only "expeditious" review. (Appellants challenge this as it should be a pre-

deprivation procedure and it is vague as to what, if any, relief can actually be granted. The Police should not have carte blanche to harass and arrest, then the speakers must seek review. If the Police want to suppress speech, then they should have to first obtain a ruling that the speech is unlawful in accordance with due process.)

Judge Cannone's order purported to carve out "[q]uiet, offsite demonstrations on public property, in areas and at times that do not interfere with trial participants' entrance into or exit from the Courthouse, and that do not interfere with the orderly administration of justice, and that are not intended to influence any trial participants in the discharge of their duties[.]" But the State Police, applying the order, told demonstrators, "nothing has changed." *See* AA373, Declaration of Jason Grant ("Grant Decl.") at ¶ 8.

On May 16, 2025, just the day after the Supplemental Order was issued, Massachusetts State Police threatened Grant for holding an American flag and a Bible verse: 2 Corinthians 3:17 ("Now the Lord is the Spirit, and Where the Spirit of the Lord is, There is Freedom"). and barred him from demonstrating with it. On May 19, 2025, Ms. Walsh was arrested for "trespassing" despite being on a public sidewalk, merely for wearing a sweatshirt that says, on the back, "Criminals Control Norfolk County." AA374 (Video of Arrest); AA372 (Grant Decl.) at ¶ 6. Walsh was charged under a) G.L. c. 268, § 13A despite the shirt not being a picket nor was she

parading; b) G.L. 266, § 120, for alleged trespass, despite public sidewalks not being within the statute's purview; and c) G.L. 272, § 53, for allegedly disturbing the peace for simply wearing the sweatshirt. *Comm. v. Walsh*, Docket No. 2554CR000636 (Dedham Dist. Ct.). Although the charges were dismissed, they never should have been brought—the process is the punishment.

And, for another example, on May 19, 2025, Thomas Derosier was peacefully filming the exterior of the Norfolk Superior Courthouse from across Pearl Street: *See* AA389 (Derosier Video). One Massachusetts State Trooper said "ok" as to where Derosier was standing, Nevertheless, Massachusetts State Trooper Sgt. Michael Hardman suddenly snapped and assaulted Derosier. He violently grabbed Derosier by the arm, injuring him, and dragged him across High Street (now catty-corner from the courthouse). This injury required medical attention.

The Constitution requires pre-deprivation review of infringements upon their First Amendment rights – not post deprivation criminal proceedings. "[There] is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975). Earlier this year, the First Circuit neatly laid out the issues regarding both pre- and post-deprivation review and the Supplemental Order fails both. As set forth in *3137, LLC v. Town of Harwich*:

Where state procedures – though arguably imperfect – provide a suitable form of **predeprivation** hearing coupled with the availability of meaningful judicial review, the fourteenth amendment guarantee of procedural due process is not embarrassed." *Chongris*, 811 F.2d at 40 (citing *Creative Env'ts, Inc. v. Estabrook,* 680 F.2d 822, 829-30 (1st Cir. 1982)). As also relevant here, the Parratt-Hudson doctrine – as developed in part in *Parratt v. Taylor,* 451 U.S. 527420 (1981) – provides: "When a deprivation of a property interest is occasioned by random and unauthorized conduct by state officials, . . . the due process inquiry is limited to the issue of the adequacy of the postdeprivation remedies provided by the state." *Hadfield v. McDonough,* 407 F.3d 11, 19 (1st Cir. 2005) (quoting *O'Neill v. Baker,* 210 F.3d 41, 42 (1st Cir. 2000)).

126 F.4th 1, 12 (1st Cir. 2025) (emphasis added). Grant, Derosier, and Walsh all had their free speech and assembly rights infringed without a pre-deprivation hearing. The post-deprivation remedy is inadequate—the "review" procedure in the Supplemental Order cannot turn back time, which is why deprivations of First Amendment rights are irreparable harms.[6] *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The procedure established in the Supplemental Order proved insufficient. On May 19, Jason Grant, Thomas Derosier, and Erica Walsh each made a request to the Norfolk County Superior Court for "relief." There was a "hearing," in which no evidence was able to be presented, where the Commonwealth declined to participate. The requestors had no opportunity to subpoena witnesses or confront adverse

---

[6] It is also a Fifth Amendment trap. It incentivizes officers to arrest and charge citizens to make the review procedure unusable.

extrajudicial statements. Judge Doolin refused to entertain argument that the Buffer Zone was imposed without due process.

Judge Doolin, in response to Mr. Derosier's request for review, found that filming on a public street was not a violation of the Buffer Zone Order, failing to undertake a First Amendment review. There was no prospective relief available. There are no damages available. The "procedure" allowed Mr. Derosier nothing except the answer to the question "does filming violate the Buffer Zone Order?" Any fool in a hurry would already know the answer to that, but apparently Norfolk County is beneath that level of analysis. The same happened for Mr. Grant. A citizen should never have to go to a court of any kind to ask "may I hold up a Bible verse?" in advance of doing so.

Moreover, Judge Cannone's actions to try and preserve the Buffer Zone wiped away any vestigial argument that it was not content nor viewpoint based. The new procedure required another judge to weigh the content of the speech and the viewpoint of the speaker to determine whether it violates the Buffer Zone. If the Bible verse did not have the word "FREEDOM," in it, for example, Judge Doolin would not have declared it a close call.

And Judge Doolin determined that "Criminals Control Norfolk County" on Erica Walsh's shirt **violated** the buffer zone. Yet, even the District Court agreed that, irrespective of this, it was "constitutionally protected speech." 2025 U.S. Dist.

LEXIS 105493, at *27 (D. Mass. May 28, 2025). Thus, the Supplemental Order's procedure was useless in addressing fundamental First Amendment protected speech.

In its order that is the subject of this appeal, the District Court eviscerated the *mens rea* requirement. It pronounced that "FKR;" "Free Karen Read;" "Convict Karen Read;" "Convict or face consequences;" "No justice, no peace – you've been warned;" "We know where you live;" ""The community is watching;" "Do the right thing;" "Imagine if defendant/victim were your family;" "Jurors, your conscience matters;" "Remember the victim's family;" "The law requires a guilty verdict in this case;" "Can't convict, no evidence;" and statements that directly target trial participants or the integrity of the trial include but are not limited to the following: "Judge Cannone is corrupt;" or "Bev's Court is a Clownshow" are all *per se* unprotected. ADD018. Strict liability offenses lack a *mens rea* element. *United States v. Leahy*, 473 F.3d 401, 408 (1st Cir. 2007). The District Court, in direct contravention of this Court's earlier decision, determined that some speech could be prohibited irrespective of *mens rea,* warranting reversal.

The District Court correctly recognized that the sweatshirt "Criminals Control Norfolk County" was lawful because it is a message "commenting or criticizing 'the system' whether that is the courts, the prosecuting agencies, or law enforcement agencies, do not constitute an intent to interfere with the administration of justice or

an intent to influence a judge, juror, witness, or court officer. Such messages criticize or call for change without referencing the outcome of the trial." ADD017-ADD018. Judge Cannone and her court are part of "the system." And by restricting commentary and criticism of Judge Cannone, or of D.A. Morrissey, or of any presiding judge or elected prosecutor, buffer zone orders prohibit political speech. The Buffer Zone orders are constitutionally overbroad. To vindicate the First Amendment, as the Buffer Zone is not narrowly tailored, a total injunction is required.

Demonstration is First Amendment protected. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 152 (1969) (describing privilege of citizens to assemble, parade, and discuss public questions in streets and parks). Content-based regulations must fit "a compelling interest and . . . narrow[] tailor[ing] to achieve that interest." *Reed v. Town of Gilbert,* 576 U.S. 155 (2015), quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011). Narrow tailoring requires the restriction to be "the least restrictive means among available, effective alternatives." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 666 (2004). Appellees' actions miserably fail this test.

There is no compelling interest in restricting a citizen from publicly and peacefully demonstrating against a judge or a prosecutor or any other government official. Appellants did nothing arising to "serious evil" justifying the restrictions

imposed and enforced by Appellees. While Judge Cannone purports to be protecting Ms. Read's right to a fair trial, Read did not seek the prior restraint—the Commonwealth did. Tellingly, Read did not even join the request. If Appellants' months of demonstrations on the sidewalks in Dedham did not compromise anyone else's right to a fair trial, they will not compromise Ms. Read's.

The District Court erroneously determined that the buffer zone was a content-neutral regulation. ADD005-ADD006. This is reversible error. Viewpoint-neutral regulations are content-based if they cannot be "justified without reference to the content of the regulated speech." *Ward*, 491 U.S. at 791. Here, only specific speech is prohibited. Ironically, the District Court cited to *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 762 (1994) (ADD006) when *that* Court specifically admonished against orders of the type Judge Cannone issued—the "drafting of a statute addressed to the general public." The District Court further erred when it asserted that the record did not indicate the buffer zone order had an "effect on some speakers or messages but not others" (ADD006, quoting *McCullen v. Coakley*, 573 U.S. at 479). AA005 at ¶ 23 provided record evidence that commercial speech was not restricted, else every business on private property in the zone would have to remove its signage. The only thing that the government requested (and that Judge Cannone prohibited) is *specific content*, specifically criticism that they do not like.

The District Court essentially adopted the Massachusetts Supreme Judicial Court determination in *Spicuzza* – **but the *Spicuzza* case is <u>useless</u> – it is a case where the SJC explicitly refused to consider whether there were First Amendment implications on public sidewalks**. *Id.* This was in a challenge brought by other citizens to a different buffer zone citing *Ward*. But still, the *Spicuzza* court seems to have proudly declared that it would not contemplate the effect of a buffer zone on public sidewalks, pretending it had no idea whether 200-feet outside a courthouse under its superintendence included sidewalks. *Id*. Therefore, reliance on *Spicuzza* is like referencing a ghost citation provided by ChatGPT, and everyone should know better. Moreover, "the constitutionality of buffer zone laws turns on the factual circumstances giving rise to the law in each individual case—the same type of buffer zone may be upheld on one record where it might be struck down on another." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 357 (3d Cir. 2016). On the record here, which is different than that *Spicuzza* record, the buffer-zone should be struck down.

The regulation imposed in *Ward* was about volume and expressly had nothing to do with content. Given what the government has used to justify this buffer zone injunction, if they were not being disingenuous about the rationale for it, they would have followed *Ward*. The government provided no real rationale for the buffer zone

than a hypothetical concern about noise.  Had the government  followed *Ward*, we would not be here.[7]

In contrast to *Ward*, one must directly look at the content of the speech barred: an individual may hold up a sign within the Zone that says "Marry Me" or "Buy Gold," but if the sign says, "Impeach Judge Cannone," "Vote for MacLellan/Perkins for Norfolk DA, Vote out Morrissey," or "Free Karen Read," it is barred.  There is nothing "incidental" about it—Judge Cannone's orders are expressly aimed at content.[8]  In *McCullen v. Coakley*, which otherwise held a 35-foot buffer zone near abortion clinics unconstitutional, the Supreme Court deemed it content-neutral because it was about public safety, access, and sidewalk obstruction; however, the Court highlighted that "the Act would not be content neutral if it were concerned with undesirable effects that arise from the direct impact of speech on its audience or listeners' reactions to speech."  573 U.S. at 481.  In contrast, Judge Cannone's injunction against Appellants and the public is directly addressed to the alleged (but imaginary) undesirable effects that might arise from the direct impact of speech on

---

[7] Despite the lack of due process and the fact that it is *ultra vires*, the Appellants would not have bothered to sue to have the right to be loud.  Of course, the police could also have simply used the disorderly conduct laws to shut down loud protest, but that is not the purpose of the buffer zone.  The purpose is to shield the government from criticism unless that criticism is shuffled off out of sight.
[8] Presumably "Karen Read is Guilty" would also be prohibited, but that only saves the buffer zone from being viewpoint-based, which is different from content-based.

others. Thus, it is necessarily a content-based, not a content-neutral restriction, subject to strict scrutiny.

Assuming, *arguendo*, the order imposing the current "buffer zone" is content neutral (which Appellants do not concede), such restrictions are subject to intermediate scrutiny, meaning they must be "narrowly tailored to serve a significant government interest, and … leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791. A court cannot meet the standard required by intermediate scrutiny without performing some analysis on the record regarding why less restrictive measures could not be adopted. *Casey*, 308 F.3d at 114. Neither Judge Cannone nor the lower court considered *any* alternative measures before creating the buffer zone injunction. The First Amendment doesn't demand the precision of a Milanese dressmaker's artisanal stitching, but it requires more than tossing a poorly fitting muumuu from a thrift store pile over Lady Liberty and calling it "good enough for government work."

Moreover, the District Court committed reversible error adopting *Spicuzza*. AA198-AA201. While a "fair trial" is a significant interest for Ms. Read, she has declared no problem with the protesters, not on the record nor in any known public comment of any kind. In fact, she did not take any position on the imposition of a buffer zone. *See* AA089 (providing link to video of Judge Cannone's hearing). Even if she did, the order is not narrowly tailored—Judge Cannone could remedy the issue

with jury instructions, simply asking the local police to enforce noise ordinances, closing the windows, or simply waiting for noise to occur and then sending officers to punish those who caused it. That is what a free society as discussed in *Conrad* would expect. *Southeastern Prom's v. Conrad*, 420 U.S. at 559.

Appellants do not dispute that there is a legitimate interest in protecting the judicial system from certain external pressures. *Cox v. Louisiana*, 379 U.S. 599, 562 (1965). However, the statute upheld in *Cox* was first of all, not ultra vires. Second, it required the *mens rea* of "intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge, juror, witness, or court officer[.]" La. Rev. Stat. § 14:401 (1962). Judge Cannone's injunction has no *mens rea* requirement like a proper statute might. It simply imposes strict liability on speech. Speech can never be subject to strict liability. Regulations that create strict liability over speech are invalid. *See, e.g., The Florida Star v. BJF*, 491 U.S. 524, 541 (1989). The Constitution prohibits the "imposition of criminal sanctions on the basis of strict liability where doing so would seriously chill protected speech." *United States v. United States District Court*, 858 F.2d 534, 540 (9th Cir. 1988). Even in the context of the indefensible evil of child pornography, "criminal responsibility may not be imposed without some element of scienter on the part of the defendant." *N.Y. v. Ferber*, 458 U.S. 747, 765 (1982). Yet here, citizens are off

to jail if they even walk through the zone taking video.[9]  A strict-liability buffer-zone injunction is wildly unconstitutional.

This is not the first highly publicized trial with demonstrators outside.  Even in *United States v. Tsarnaev*, Case No. 1:13-cr-10200-GAO (D. Mass.), where protesters were quite vocally against the defense, far more likely to chafe the Sixth Amendment, Judge O'Toole exercised restraint and recognized the limits of his powers.  We should honor his wise decision honoring his oath to the Constitution.

This is the first known case to ban demonstrators from sidewalks and public spaces and at a sprawling distance greater than that permitted for even anti-abortion protesters. *McCullen, supra* (declaring 35-foot buffer zone unconstitutional).  The order need not facially sweep up such a broad array of speech, including silent protest. The government "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward, supra*, at 799.  Restraining silent protest does not advance the purported "noise" goal. This is especially where the alleged noise was not asserted to have affected deliberations.  AA125 at ¶ 10 (Affidavit of Juror Doe). And it most certainly should not license the Mass. State Police's use of the zone to harass newsgathering and simply "walking with a sticker on one's jacket." *See Derosier, supra,* and *Delgado, supra.*

---

[9] *See supra* n. 3.

To the extent the District Court relied on Judge Cannone's findings, the purported hearsay evidence was never challenged, because there was neither notice nor opportunity to be heard. It is compounding a constitutional violation on top of a constitutional violation. And it does not leave open ample alternative channels— the news media cover the area closest to the courthouse, leaving Appellants unheard. One cannot say that there are ample alternative avenues for expression if protesters are simply shuffled away from where the action is. An anti-abortion protester must be allowed to protest near the entrances to clinics, while not impeding access, because that is where the audience is. *McCullen,* 573 U.S. at 488-90 (buffer zone unconstitutionally precluded speakers from identifying and communicating with intended audience). The relationship between public presence and "expressive conduct is intimate and profound." *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1059 (7th Cir. 2004). Similarly, here, Appellants should not be relegated to being allowed to speak where their audience is not.

The *Spicuzza* Court asserted the buffer zone was narrowly tailored because 200 feet is less than the 500 feet the Commonwealth requested. That was not a considered analysis. 494 Mass. at 1008. If the government wants an unconstitutional restriction and gets half of what it requested, that is not narrow tailoring—would 500 feet be "narrow tailoring" if they ask for 1000 feet next time? Thirty feet from the doorway is enough to ensure passage, if passage is a concern.

Of course, impeding anyone from accessing the courthouse at all is a violation of an existing statute. So if the alternative means would be to simply use G.L. c. 268, § 13C (prohibiting disruption of court proceedings) then what is the purpose of the buffer zone, but to shuffle anti-government protest far away from where any real audience may be to receive the message the Appellants seek to share?

As to the fear of extraneous influence, the only evil the restriction seems to cure is *noise.* AA087. Curative jury instructions or a "quiet rule" would suffice. While the *Spicuzza* Court asserted there were ample alternative channels, it made this pronouncement in the absence of record evidence and identified none. 494 Mass. at 1008. It just blurted out some words without any support for them. Again, *Spicuzza* is of no value.

Not only is it a content-based restriction, Judge Cannone's order restricted speech on public sidewalks and spaces, *i.e.* traditional public forums. Sidewalks, including around courthouses, are traditional public forums. *Cornelius v. NAACP*, 473 U.S. 788, 817 (1985); *United States v. Grace*, 461 U.S. 171, 177 (1983), quoting *Perry Education Assn. v. Perry Local Educator's Assn.*, 460 U.S. 37, 45 (1983). Public streets and sidewalks, "are presumptively traditional public forums, and the Supreme Court repeatedly reaffirmed their status as places for expressive activity." *Watchtower Bible & Tract Soc'y of N.Y., Inc v. Jesus*, 634 F.3d 3, 11 (1st Cir. 2011). "Sidewalk protests… are commonly associated with more particularized dissent. A

sidewalk demonstration is often linked to a specific business or institution, focusing attention on what is occurring at that moment at that place[.]" *Sullivan v. City of Augusta*, 511 F.3d 16, 53 (1st Cir. 2007). If Appellants are demonstrating 200+ feet away, they cannot focus attention on what is occurring at the courthouse. And content-based restrictions on political speech in a public forum are subject to 'exacting', or strict, scrutiny. *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018).

Again, in 2015, Judge O'Toole recognized that *McCullen* precluded establishing even a 35-foot buffer zone relative to *United States v. Tsarnaev*, Case No. 1:13-cr-10200-GAO (D. Mass.). AA202. And the Moakley Courthouse appropriately had protesters on its sidewalks during that trial. *Id.* The *Spicuzza* Court expressly avoided reaching the issue of sidewalks, asserting that it did not have a sufficient record to determine if sidewalks existed inside the buffer zone. 494 Mass. at 1008. Unlike *Spicuzza*, the record here includes verified statements that the buffer zone includes sidewalks and other traditional public forums. Judge Cannone's buffer-zone injunction lacked any narrow tailoring and it must never be repeated nor should there be a reward to her for the Constitutional violations her actions represented.

## 4.0     Appellants Face Irreparable Harm[10]

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

## 5.0     The Balance of Equities Tips in Appellants' Favor

When the government restricts First Amendment rights, the balance of hardships weighs in a plaintiff's favor. *See Firecross Ministries v. Municipality of Ponce*, 204 F. Supp. 2d 244, 251 (D. P.R. 2002) (holding that "insofar as hardship goes, the balance weighs heavily against Defendants, since they have effectively silenced Plaintiffs' constitutionally protected speech"), *citing Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 563 (1975) (Douglas, J., concurring in part). Failing to grant the injunction will continue to deprive Appellants, and the public, of their constitutional rights. Appellees will suffer no harm. An injunction will merely restore the rights Appellants are guaranteed by the U.S. Constitution.

## 6.0     Injunctive Relief is in the Public Interest

"Protecting rights to free speech is *ipso facto* in the interest of the general public." *Cutting v. City of Portland*, 2014 U.S. Dist. LEXIS 17481, at *36 (D. Me. Feb. 12, 2014) (internal quotation marks omitted), *aff'd*, 802 F.3d 79 (1st Cir. 2015).

---

[10] The District Court did not assess the remaining factors once it determined likelihood of success. ADD010 at n. 3.

Members of the public are prohibited from speaking. The *Derosier* and *Delgado* plaintiffs have had their rights abridged and Ms. Walsh was wrongly arrested and charged. Further, members of the public have a right to hear Appellants' protests. Thus, the public interest favors enjoining buffer zone orders.

## CONCLUSION

The Court should reverse the denial of the preliminary injunction and remand for the entry of an injunction prohibiting all such buffer zone orders and for further proceedings.

Date: September 3, 2025.
Respectfully submitted,

RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
Marc J. Randazza (Bar No. 90629)
Jay M. Wolman (Bar No. 1135959)
30 Western Avenue
Gloucester, MA 01930
Tel: (888) 887-1776
ecf@randazza.com

Mark Trammell
CENTER FOR AMERICAN LIBERTY
P.O. Box 200942
Pittsburgh, PA 15251
Tel: (703) 687-6200
MTrammell@libertyCenter.org

*Attorneys for Appellant*s

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 9,587 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Date: September 3, 2025.        RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
MARC J. RANDAZZA

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: September 3, 2025.                    RANDAZZA LEGAL GROUP, PLLC

                                             /s/ Marc J. Randazza
                                             MARC J. RANDAZZA

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

| Date Filed | Description | Page |
|---|---|---|
| 05/28/2025 | Order Granting in Part Denying in Part Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction [Dkt. No. 76] | ADD001 – ADD020 |
| 06/06/2025 | Notice of Appeal to Order for Motion for Temporary Restraining Order and Preliminary Injunction [Dkt. No. 78] | ADD021 – ADD022 |

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

———————————————————————

JASON GRANT, ALLISON TAGGART,                )
LISA PETERSON, and SAMANTHA                  )
LYONS,                                       )
              Plaintiffs,         )
                                         )
              v.                 )    Civil Action No. 25-10770-MJJ
                                         )
TRIAL COURT OF THE COMMONWEALTH              )
OF MASSACHUSETTS, BEVERLY J.                 )
CANNONE, in her official capacity as Justice )
of the Superior Court, GEOFFREY NOBLE,       )
as Superintendent of the Massachusetts State )
Police, MICHAEL d'ENTREMONT, in his          )
official capacity as Chief of Police Department )
of the Town of Dedham, Massachusetts, and    )
MICHAEL W. MORRISEY, in his official         )
Capacity as the Norfolk County District      )
Attorney,                                    )
              Defendants.         )

———————————————————————

## MEMORANDUM AND ORDER ON PLAINTIFFS'
## MOTION FOR TEMPORARY RESTRAINING ORDER

May 28, 2025

JOUN, D.J.

      On April 1, 2025, four Massachusetts residents, Jason Grant, Allison Taggart, Lisa

Peterson, and Samantha Lyons (collectively, "Plaintiffs") filed suit against defendants Trial

Court of the Commonwealth of Massachusetts; Beverly J. Cannone, in her official capacity as

Justice of the Superior Court ("Judge Cannone"); Geoffrey Noble, as Superintendent of the

Massachusetts State Police; Michael d'Entremont, in his official capacity as Chief of the Police

Department of the Town of Dedham, Massachusetts; and Michael W. Morrisey, in his official

1

**ADD001**

capacity as the Norfolk County District Attorney (collectively, "Defendants"). [Doc. No. 1]. Plaintiffs challenge buffer zone orders issued by Judge Cannone during the *Commonwealth v. Karen Read*, No. 22-cr-0017 (Mass. Sup. Ct.) trial, alleging that the orders impose unconstitutional prior restraint in violation of the First Amendment and Plaintiffs' due process rights. Plaintiffs further allege that police are enforcing the buffer zone order in an arbitrary and discriminatory manner. Plaintiffs seek a preliminary injunction "enjoining each Defendant from interfering with Plaintiff's right to lawfully engage in constitutionally protected expression and activity." [*Id.* at 11]. For the reasons stated below, Plaintiffs' Motion for Preliminary Injunction, [Doc. No. 2], is <u>DENIED</u> in part and <u>GRANTED</u> in part.

## I.    BACKGROUND

### A.  <u>The Buffer Zone Orders</u>

Karen Read is charged with the murder of her boyfriend, Boston police officer John O'Keefe. This case has garnered significant media attention and public interest. The trial of the matter first commenced on April 16, 2024, but resulted in a mistrial on July 1, 2024. The retrial began on April 1, 2025, and is presently ongoing.

During the first trial, on April 4, 2024, Judge Cannone issued a buffer zone order (the "2024 Order") which prohibited any individual from "demonstrat[ing] in any manner, including carrying signs or placards, within 200 feet of the courthouse complex during trial of this case." [Doc. No. 1-2 at 3]. The 2024 Order was challenged. The Supreme Judicial Court upheld it, stating that "the trial judge struck a balance between the right to protest or demonstrate and the defendant's right to a fair trial." *Spicuzza v. Commonwealth*, 494 Mass. 1005, 1008 (2024).

Prior to the retrial, on March 25, 2025, Judge Cannone reestablished the buffer zone and entered an order (the "2025 Order") stating that "no individual may demonstrate in any manner, including carrying signs or placards, within 200 feet of the courthouse complex during trial of

ADD002

this case." [Doc. No. 1-4 at 4]. Additionally, Judge Cannone modified the original 2024 Order to extend the 200-foot buffer zone to include an open space on the western side of the courthouse complex. [*Id.* at 3–4]. On April 1, 2025, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction, [Doc. No. 2], seeking enjoinment of Judge Cannone's 2025 Order. On April 11, 2025, I denied Plaintiffs' Motion, citing *Spicuzza* and finding that Plaintiffs had not demonstrated a likelihood of success on the merits of their claims. [Doc. Nos. 38, 40]. Plaintiffs appealed, and on May 9, 2025, the First Circuit vacated the denial and remanded the case back to this Court. [Doc. No. 52].

### B.  The First Circuit Decision and Judge Cannone's Supplemental Order

In its decision, the First Circuit stated that "Plaintiffs have suggested to us that they challenge the [2025] Order as applied to quiet, offsite demonstrations on public property, in areas and at times that do not interfere with trial participants' entrance into and exit from the Courthouse, that do not interfere with the administration of justice, and that will not influence any trial participants in the discharge of their duties." *Grant v. Trial Ct. of Commonwealth of Massachusetts*, No. 25-cv-1380, 2025 WL 1355193 at *3 (1st Cir. May 9, 2025). The First Circuit remanded the "case for further proceedings to determine how the Order has been interpreted and applied and whether the lack of a mens rea requirement renders the [March 25] Order insufficiently tailored." *Id.* at *4. Finally, the First Circuit stated that "the state court could, entirely of its own volition, further simplify any potential First Amendment issues by amending the [2025] Order to introduce a mens rea requirement as in *Cox* and Mass. Gen. Laws ch. 268, § 13A (2025)—i.e., by limiting the [2-25] Order to demonstrations directed toward interfering with the administration of justice or influencing trial participants." *Id.*

Taking that cue, on May 15, 2025, Judge Cannone issued a Supplemental Order Regarding the Buffer Zone (the "Supplemental Order") which referenced the 2025 Order

(together, the "Buffer Zone Orders"). *See* [Doc. No. 61-1 at 1–2]. The Supplemental Order

states,

> To simplify any potential First Amendment issues related to the Buffer Zone restrictions implemented by prior orders, this court, guided by the Court of Appeal's suggestion set out on page 12 of The Decision, issues the following supplemental order regarding the Buffer Zone:
>
> First, for all the reasons cited in support of prior orders and based upon the parameters of the dispute as narrowed and described in the Decision, all orders of this court remain in place insofar as they apply to Courthouse property.
>
> Second, prior orders remain in place as applied to pathways – including public sidewalks and roads – through which and at which times trial participants enter and exit the Courthouse.
>
> Third, noisy protests, including those using amplified sound, honking horns or loud screaming and yelling that are intended to interfere with the administration of justice or are intended to influence any judge, juror, witness, or court officer in the discharge of his or her duties are prohibited within the buffer zone.
>
> Fourth, the display of written or graphic materials that are intended to interfere with the administration of justice or are intended to influence any judge, juror, witness, or court officer in the discharge of their duties are prohibited within the buffer zone.
>
> Fifth, any person whose activity has been restricted by an officer enforcing this order may request review by a judge of the Superior Court, which request shall be heard as expeditiously as possible.
>
> Quiet, offsite demonstrations on public property, in areas and at times that do not interfere with trial participants' entrance into or exit from the Courthouse, and that do not interfere with the orderly administration of justice, and that are not intended to influence any trial participants in the discharge of their duties are specifically outside the scope of the Buffer Zone restrictions.

[*Id*.]. Plaintiffs challenge the Buffer Zone Orders. At the parties' request, I set an expedited

briefing schedule and held a hearing on May 22, 2025.[1] [Doc. No. 71].

---

[1] I acknowledge the amici brief in support of Plaintiffs filed by The First Amendment Lawyers Association, Foundation for Individual Rights and Expression, and National Press Photographers Association. [Doc. No. 73].

C. **Police Enforcement of the Buffer Zone Orders**[2]

1. **Mr. Michael Bryant and Mr. John Delgado**

Michael Bryant is a Host and Executive Producer with Justice Served TV, LLC. [Doc. No. 9-1 at ¶ 2]. On April 1, 2025, Mr. Bryant was "news gathering" inside the buffer zone when he was approached by two unidentified Massachusetts State Police troopers who told him that he could not remain in the area, even though he was not protesting. [*Id.* at ¶¶ 8-9]. While walking, Mr. Bryant saw the Officers approach John Delgado. [*Id.* at ¶ 10]. Mr. Delgado was wearing a blue sticker that says, "Real Justice for John O'Keefe FKR." [*Id.* at ¶ 11]. A trooper told Mr. Delgado, "That's gotta go" in reference to Mr. Delgado's sticker. [*Id.* at ¶ 12]. The trooper then ripped Mr. Delgado's sticker off his jacket and said, "I don't want to see you walking by here again." [*Id.* at ¶¶ 13-14].

2. **Mr. Thomas Derosier**

On April 1, 2025, Thomas Derosier was confronted by Sergeant Hardman outside of the Norfolk Superior Courthouse and was told that without proper media credentials, he would need to be outside of the buffer zone, or he would be arrested. [25-cv-10812 Doc. No. 1-5 ("Exhibit E, Tom Derosier Video April 1, 2025"); Doc. No. 69-3 at ¶ 10]. On May 19, 2025, while Mr. Derosier was filming within the buffer zone in the unloading area for the O'Keefe family, the defense team, and the prosecution, Sergeant Hardman told Mr. Derosier to leave immediately. [Doc. No. 69-3 at ¶¶ 11, 13]. When Mr. Derosier did not comply, he was physically grabbed and dragged out of the buffer zone by Sergeant Hardman, injuring Mr. Derosier's left arm. [*Id.* at ¶ 13].

---

[2] Facts are gleaned from the Complaint, supporting declarations, affidavits, and police reports, as well as the various other related Complaints (25-cv-10812, 25-cv-10818, and 25-cv-11344), and are taken as true for purposes of deciding Plaintiffs' Motion for Preliminary Injunction.

**ADD005**

### 3.  Ms. Erica Walsh

On Friday, May 9, 2025, Erica Walsh was present within the buffer zone while wearing a sweatshirt that read "Criminals Control Norfolk County." [Doc. No. 56-1 at ¶¶ 2–5]. As Ms. Walsh was leaving a bathroom and heading to her vehicle that was parked within the zone, she was surrounded by three unknown Massachusetts State Police troopers. [*Id. a*t ¶ 6]. The troopers detained Ms. Walsh, saying words to the effect of "You're not going anywhere." [*Id.* at ¶ 7]. At that point, one of the troopers stated, "You're gonna catch a charge," [*Id.* at ¶ 8], indicating he was going to charge Walsh with a criminal offense for wearing the sweatshirt. Ms. Walsh complied and removed the sweatshirt. [*Id*. at ¶ 12]. Underneath the sweatshirt, Walsh was wearing a t-shirt that read "Journalism is not a crime" and "Free Turtleboy" and included the face of Aidan Kearney.[3] [*Id*. at ¶¶ 12-13]. Ms. Walsh had asked a Dedham police officer whether this shirt was permitted within the buffer zone, and the officer replied that he was unsure whether it was. [*Id.* at ¶ 15]. To ensure she could get to her car without being arrested, Ms. Walsh felt she had no choice but to remove her t-shirt and walk through the buffer zone clad only in a brassiere on top. [*Id.* at ¶¶ 15-16].

On Monday, May 12, 2025, Ms. Walsh was again wearing the sweatshirt in the buffer zone when she was confronted by Sergeant Hardman. [*Id.* at ¶ 17]. Sergeant Hardman said words to the effect of "you're causing a …", though he never said what Ms. Walsh was causing, and further stated that Ms. Walsh was "told about this."  [*Id.*]. On May 19, 2025, Ms. Walsh was charged with trespass and picketing at Dedham District Court for wearing the same sweatshirt and a hat labeled "FKR," which stands for "Free Karen Read." [Doc. No. 67-3 at 4]. After

---

[3] Mr. Kearney, also known as "Turtleboy," is an online blogger and self-described journalist who was arrested and charged with witness intimidation in connection with the Karen Read trial. [Doc. No. 56-1 at ¶ 13]

**ADD006**

initially sitting in front of Norfolk Superior Court (on a cement slab that separates the front lawn of the Registry of Deeds and the sidewalk in front of the courthouse) with her camera crew and her attorney for approximately five minutes, Ms. Walsh (along with her attorney and camera crew) then walked southbound on the sidewalk of High Street, where she was stopped by Sergeant Hardman and Officer Ryan Welsh. [*Id.*]. Sergeant Hardman demanded Ms. Walsh to take off her sweatshirt or be subject to arrest. [*Id.*]. When Ms. Walsh's attorney stated that Ms. Walsh would not answer questions at that time, Sergeant Hardman placed Ms. Walsh under arrest. [*Id.*].

### 4. **Mr. Jason Grant**

On or about May 16, 2025, Plaintiff Jason Grant stood across the street from the Norfolk Superior Courthouse while holding an American flag and a sign containing a Bible verse that stated: "2 Corinthians 3:17: Now the Lord is the Spirit, and Where the Spirit of the Lord is, There is Freedom." [Doc. No. 67-1 at ¶¶ 4-5; Doc. No. 68-1 at 3]. Mr. Grant was warned by Massachusetts State Police Sergeant Michael Hardman that signs related to the trial were restricted inside the buffer zone. [Doc. No. 69-3 at ¶ 15]. Sergeant Hardman also informed Mr. Grant that he would "attempt to get better clarity regarding his sign" and consulted Norfolk County First Assistant District Attorney Lisa Beatty, who instructed Sergeant Hardman to allow the sign for the day and noted that the issue would be "revisit[ed]" on the following Monday on May 19, 2025. [*Id*. at ¶¶ 15-16]. Sergeant Hardman then approached Mr. Grant and told him that he could display the sign. [*Id.* at ¶ 16]. Mr. Grant did not display the sign for the rest of the day but displayed it the following Monday, May 19, 2025, while standing in front of the Registry of Deeds. [*Id.*]. At some point, the police did not permit Mr. Grant to stand across the street from the courthouse while holding the American flag and a sign displaying Corinthians 3:17, although

7

**ADD007**

it is unclear from the record exactly when Mr. Grant was prohibited from doing so. [Doc. No. 68-1 at 3]. After the Supplemental Order was issued, Mr. Grant was told by Massachusetts State Police that "nothing has changed" regarding the buffer zone. [Doc. No. 67-1 at ¶ 8].

## II.    MOOTNESS

Defendants argue that Plaintiff Grant's claim is moot, because even though he was initially prohibited from protesting, Mr. Grant has since been permitted to protest quietly with his sign. I disagree. "Where during litigation a defendant ceases to engage in challenged conduct and restores the *status quo ante,* the lawsuit may or may not be moot. The Supreme Court has said that such a case is moot only if the defendant meets his 'heavy burden' of persuading the court that it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Adams v. Bowater Inc*., 313 F.3d 611, 613 (1st Cir. 2002) (cleaned up). That Mr. Grant, one individual, has been allowed to protest quietly with his one particular sign does not make it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id*. "Unlike in other constitutional contexts, in the speech context, we 'may assume a substantial threat of future enforcement absent compelling contrary evidence.'" *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 (2024) (quoting *Barilla v. City of Houston*, 13 F.4th 427, 433 (5th Cir. 2021)). It is undisputed that the high-profile Karen Read trial is ongoing and continues to engender public interest and that individuals like Mr. Grant continue to engage in protected speech activities at or near the courthouse. Furthermore, Defendants dispute that Plaintiffs have shown they are likely to succeed on their claim that the Supplemental Order was unlawfully enforced against protestors. *Adams*, 313 F.3d at 614 (finding that a defendant's unwillingness to admit to unlawfulness of statute was "a predicate point" to determining likelihood of recurrence). Thus, Plaintiff Grant's claim is not moot.

**ADD008**

## III.     STANDING

To show Article III standing for injunctive relief, the plaintiff must allege a "real and immediate" threat of present or future injury that is not merely "conjectural or hypothetical." *City of Los Angeles v. Lyons,* 461 U.S. 95, 108, 103 (1983). Defendants argue that Plaintiffs Taggart, Peterson, and Lyons have not suffered any cognizable harm based on the actions of the Massachusetts State Police. Defendants are correct that no showing has been made that the Buffer Zone Orders were directly applied to Plaintiffs Taggart, Peterson, and Lyons specifically. However, crediting allegations of fear to engage in protesting activities due to the enforcement of the Buffer Zoner Orders, I find that Plaintiffs have shown that they suffered injury in fact due to a chilling effect on their First Amendment speech activities.[4] Specifically, Plaintiffs allege that enforcement of the Buffer Zone Orders has resulted in an ongoing chilling effect on Plaintiffs' protected speech activities within the buffer zone, which "arise[s] from an objectively justified fear of real consequences." *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004). Here, Plaintiffs have sufficiently shown that other protestors—including named Plaintiff Grant—have been unlawfully prohibited from speech related activities, resulting in at least one instance of arrest and criminal charges. *See infra* Section IV.2. Therefore, Plaintiffs have standing.

## IV.     PRELIMINARY INJUNCTION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Gren* 553 U.S. 674, 689 (2008)). Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities

---

[4] *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–164 (2014) (citing *Babbitt v. Farm Workers,* 442 U.S. 289, 298 (1979)) ("[A] plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'").

ADD009

tips in [their] favor, and that an injunction is in the public interest." *Id.* at 20. Among these four factors, the likelihood of success is the "main bearing wall" of the analysis. *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (cleaned up).

## A. <u>Likelihood Of Success</u>

I begin with the likelihood of success on the merits, which is considered the most important of the four elements and the "sine qua non" of the calculus. *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020). Plaintiffs allege that their First Amendment rights are actively being violated by the Buffer Zone Orders because they are content-based, not narrowly tailored, and constitute a vague unconstitutional regulation. Plaintiffs further argue the Buffer Zone Orders are unconstitutional as applied. In contrast, Defendants argue that the Supplemental Order contains a mens rea requirement as mandated by the First Circuit and that most of the Plaintiffs have not made a showing as to how the buffer zone orders have been applied to them.

### 1. <u>The Facial Challenge to the Supplemental Buffer Zone Order</u>

#### a. <u>Constitutional Standard</u>[5]

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (citing U.S. Const. amend. I). The Supreme Court, however, has "regularly rejected the assertion that people who wish 'to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.'" *United States v. Grace*, 461 U.S. 171, 177-78 (1983). "In a traditional or designated public forum, content-neutral

---

[5] As an initial matter, Plaintiffs contend that the Superior Court did not have any authority to enter the Supplemental Order. A court has inherent authority to protect the fairness and integrity of the judicial process and ensuring fair procedure for all parties. This necessarily means guarding against external pressure or influence that poses a danger to the proper administration of justice.

ADD010

restrictions on the time, place, and manner of expression must be narrowly tailored to serve some substantial governmental interest, and must leave open adequate alternative channels of communication." *New England Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 20 (1st Cir. 2002). If the restriction is not content neutral then it "must satisfy strict scrutiny—that is, it must be the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014).

### b.  <u>Content Based</u>

The parties do not dispute that the speech at issue is protected by the First Amendment and that the location at issue is a traditional or designated public forum. Instead, they dispute whether the Buffer Zone Orders are content neutral.

Here, in relevant part, the Supplemental Order keeps intact the prior order "as applied to pathways – including public sidewalks and roads – through which and at which times participants enter and exit the Courthouse," and bars "noisy protests, including those using amplified sound, honking horns or loud screaming and yelling" and "the display of written or graphic materials *that are intended to interfere with the administration of justice or are intended to influence any judge, juror, witness, or court officer in the discharge of their duties*" within the buffer zone. [Doc. No. 61-1 at 1 (emphasis added)]. Although "[a]ny protest against the defendant, and in support of the Commonwealth, would be equally subject to the restrictions of the buffer zone," *Spicuzza v. Commonwealth*, 494 Mass. 1005, 1008 (2024), the Supplemental Order requires "enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *Coakley*, 573 U.S. at 479 (cleaned up). Thus, the Supplemental Order is content based and will only be upheld as constitutional "so long as the state has a compelling interest and the statutes are narrowly tailored to promoting that interest." *O'Neil v. Canton Police Dep't*, 761 F. Supp. 3d 299, 306 (D. Mass. 2024).

11

### c.  <u>Narrowly Tailored To Serve A Compelling Government Interest</u>

In remanding, the First Circuit identified that the 2025 Order "lack[ed] a mens rea requirement  -- i.e., it likely applies equally to speech directed toward random passersby and speech directed toward trial participants." *Grant*, No. 25-cv-1380, 2025 WL 1355193 at *4. In response, Judge Cannone incorporated a mens rea requirement in her Supplemental Order to ensure Ms. Read receive a fair trial unimpeded from what the Supreme Court has described as "the pressures which picketing near a courthouse may create." *Cox v. State of La.*, 379 U.S. 559, 562 (1965). Specifically, the Supplemental Order applies to certain actions that "*are intended to* interfere with the administration of justice or *are intended* to influence any judge, juror, witness or court officer." [Doc. No. 61-1 at 1 (emphasis added)].

Plaintiffs do not meaningfully contest that there is a compelling state interest.[6] Instead, Plaintiffs advance several arguments that the Buffer Zone Orders are not narrowly tailored.[7] Plaintiffs first challenge the 200-foot zone as too expansive. They next challenge paragraph 4 of the Supplemental Order. I discuss these in turn.

---

[6] "There can be no question that a State has a legitimate interest in protecting its judicial system from the pressures which picketing near a courthouse might create. Since we are committed to a government of laws and not of men, it is of the utmost importance that the administration of justice be absolutely fair and orderly. This Court has recognized that the unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy." *Cox v. State of La.*, 379 U.S. 559, 562 (1965).

[7] I note that Plaintiffs' representations before me have at times been incongruent with representations made to the First Circuit. For example, Plaintiffs seek to challenge paragraph 2 of the Supplemental Order, which maintains prior orders "as applied to pathways – including sidewalks and roads – through which and at which times trial participants enter and exit the Courthouse" *See* [Doc. No. 61-1 at 1]. However, Plaintiffs stated at oral argument before the First Circuit "that they do not seek to demonstrate along the pathways -- including public sidewalks and roads -- through which trial participants enter and exit the Courthouse." *Grant v. Trial Ct. of Commonwealth of Massachusetts*, No. 25-cv-1380, 2025 WL 1355193 at *2 (1st Cir. May 9, 2025). Plaintiffs also appear to have abandoned their challenge to the Order regarding "noisy protests" as they have represented to the First Circuit that they challenge the buffer zone as applied to "quiet" protests only.

12

**ADD012**

Plaintiffs' first ground for challenge can be addressed briefly. Plaintiffs contest the 200-foot buffer zone, not including courthouse property, but extending to roads and sidewalks through which trial participants enter and exit the courthouse. Plaintiffs also contest the extension of the buffer zone to the west side of the courthouse. In *Cox*, the Supreme Court examined whether the statute was unconstitutionally vague for failure to define the word "near" in relation to a demonstration that took place exactly 101 feet away from the courthouse steps. 379 U.S. at 568. Here, I am not in the best position to determine whether the areas bounded by the Buffer Zone Orders are too expansive. As the First Circuit observed, it is the trial judge who "sees and hears the witnesses at first hand" and who "is in a unique position to evaluate" the procession of the trial. *Chen v. Holder*, 703 F.3d 17, 24 (1st Cir. 2012). Further, the trial judge has "the best coign of vantage" and is "uniquely positioned to weigh the parties' staffing needs, assess the reasonableness of their handling the case, and evaluate the quality and relevance of the services rendered." *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 298 (1st Cir. 2001). It is the trial judge who is in the best position to make "on-the-spot judgments." *Chen*, 703 F.3d at 24. I, therefore, on the record before me, must defer to Judge Cannone.

Next, Plaintiffs' appear to challenge two separate aspects of paragraph 4 of the Supplemental Order. Turning to the first part of the challenge, regarding the meaning of the phrase "interfere with the administration of justice," [Doc. No. 61-1 at 1], "Black's Law Dictionary defines 'obstructing the administration of justice' and 'interfering with the administration of justice' as '[t]he skewing of the disposition of legal proceedings, as by fabricating or destroying evidence, witness-tampering, or threatening or intimidating a judge.'" *United States v. Seefried*, 639 F. Supp. 3d 8, 11 (D.D.C. 2022 (citing *Perverting the Course of Justice*, Black's Law Dictionary (11th ed. 2019)). This definition suggests a narrower interpretation of the phrase than applicable to the facts in this case. I note however that the

verbiage of M.G.L. c. 268 § 13A is nearly identical to the language of the Louisiana statute that was upheld by the Supreme Court.[8] *Cox*, 379 U.S. at 561. On this issue, I am bound by *Cox*.

Plaintiffs' other part of the challenge pertains to the types of people who are protected by the Buffer Zone Orders. Plaintiffs have no quarrel with protecting jurors and witnesses. Indeed, there is a profound interest in protecting the impartiality of both jurors and witnesses. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an *impartial jury* of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. Courts must take strong measures to guard the defendant's right to an impartial jury and "ensure that the balance is never weighed against the accused" given "the difficulty of effacing prejudicial publicity from the minds of jurors." *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966); *Chandler v. Florida*, 449 U.S. 560, 575 (1981). Regarding witnesses, the Third Circuit has noted that, "disqualification of witnesses [because of exposure to pretrial publicity] may have [the] effect" of preventing trial of a defendant. *U.S. v. Zeiler*, 470 F.2d 717, 719-20 (3rd Cir. 1972). In other words, "[w]itnesses are not so fungible." *Id*. at 720.

Although not explicitly argued, by their inclusion in the record of signs that read, "Bev's Court is a Clownshow" and "Judge Cannone is Corrupt," I surmise that Plaintiffs' quibble is with the inclusion of judges and court officers as classes of individuals also needing protection. And

---

[8] *Compare* M.G.L. c. 268 §13A:

> Whoever, with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge, juror, witness, or court officer, in the discharge of his duty, pickets or parades in or near a building housing a court of the commonwealth . . . shall be punished by a fine of not more than five thousand dollars or by imprisonment for not more than one year, or both.

*with* LSA—Rev.Stat. s 14:401 (Cum.Supp.1962):

> Whoever, with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge, juror, witness, or court officer, in the discharge of his duty pickets or parades in or near a building housing a court of the State of Louisiana * * * shall be fined not more than five thousand dollars or imprisoned not more than one year, or both.

perhaps judges and court officers should not be entitled to the same level of protection as jurors and witnesses. Afterall, they are expected to weather a fair amount of criticism leveled at them. *See Craig v. Harney*, 331 U.S. 367, 376 (1947) ("Judges are supposed to be men [and women] of fortitude, able to thrive in a hardy climate"). In normal circumstances, such criticism would certainly be tolerable under the First Amendment; however, in this present context—a highly charged criminal trial—prohibiting direct attacks pertaining to the credibility and authority of the court and trial judge constitutes permissible restraint. As the Supreme Court recognized, judges and court officers "are human" too and may "be consciously or unconsciously influenced by demonstrations in or near their courtrooms both prior to and at the time of the trial." *Cox*, 379 U.S. at 565. More importantly, jurors may be improperly influenced by such messages.

Recently, another session within this district examined whether M.G.L. c. 268 § 13A was narrowly tailored to serve a compelling government interest. *O'Neil*, 761 F. Supp. 3d at 306-308. In that case, Judge Denise Casper determined that "the statute itself is narrowed by an intent requirement that aligns with the Defendants' compelling interest in protecting the administration of justice." *Id*. at 308. Given that M.G.L. c. 268 § 13A tracks the language of the Louisiana statute which was upheld by the Supreme Court, and the Supplemental Order includes substantially the same mens rea language as M.G.L. c. 268 § 13A, I must conclude that the Supplemental Order is narrowly tailored to serve a compelling government interest.

### d.  Substantive Due Process Vagueness

"A statute is impermissibly vague for lack of notice only if it 'prohibits . . . an act in terms so uncertain that persons of average intelligence would have no choice but to guess at its meaning and modes of application.'" *Frese v. Formella*, 53 F.4th 1, 10 (1st Cir. 2022) (cleaned up). I again adopt Judge Casper's reasoning and find that the Supplemental Order is not unconstitutionally vague. *O'Neil*, 761 F. Supp. 3d at 308–309. Here, the Supplemental Order

15

provides clear notice regarding what it means "to interfere with the administration of justice or [to intend] to influence any judge, juror, witness or court officer are prohibited within the buffer zone." [Doc. No. 61-1 at 1]. "[I]t is not the simple act of holding up a sign that is prohibited, but engaging in conduct with the intent of directly or indirectly influencing [a juror or a witness]." *O'Neil*, 761 F. Supp. 3d at 309. A person of average intelligence would not have to guess what it means to interfere with the administration of justice or to intend to influence a judge, juror, witness or court officer. *Frese*, 53 F.4th at 11. Thus, the Supplemental Order is not unconstitutionally vague on its face.

## 2.  As Applied Challenge to the Supplemental Buffer Zone Order

Plaintiffs argue that the Massachusetts State Police have been ignoring the Buffer Zone Orders without consequence and are unlawfully prohibiting protestors' speech activities. If the Buffer Zone Orders are narrowly tailored to meet a compelling state interest and is otherwise not unconstitutionally vague on its face, Plaintiff argue, surely the application of the Orders is. On this score, Plaintiffs have a winning argument.

The First Circuit has held that while a "statute was valid on its face, it was still possible that enforcement against a given person in a particular situation could be invalid on an as-applied basis." *McGuire v. Reilly*, 386 F.3d 45, 61 (1st Cir. 2004). Here, although the Buffer Zone Orders are clear, the record shows a persistent pattern of arrests or threats of arrest to protesters and non-protesters alike who are complying with the Buffer Zone Orders. The buffer zone is not a people-free zone. The public has the right of access, not only to the sidewalks and pathways of the courthouse, but access into the courthouse itself. The Buffer Zone Orders may be enforced only against those individuals who engage in activities that are intended to interfere with the administration of justice or are intended to influence trial participants in the discharge of their duties within the buffer zone.

16

**ADD016**

On April 1, 2025, Mr. Bryant was "news gathering" inside the buffer zone when he was approached by two troopers who told him that he could not remain in the area, even though he was not protesting. [*Id.* at ¶¶ 8-9]. Also on April 1, 2025, Sergeant Hardman confronted Mr. Derosier and told him, "You don't have media credentials, you've got to go behind the buffer zone, or you're going to be subject to arrest." [25-cv-10812 Doc. No. 1-5 ("Exhibit E, Tom Derosier Video April 1, 2025"). Neither Mr. Bryant or Mr. Derosier did anything with the intent to influence any judge, juror, witness, or court official or with the intent to interfere with the administration of justice.

After the Supplemental Order was issued, on May 19, 2025, Mr. Derosier was again confronted by Sergeant Hardman, and this time, was physically grabbed and dragged away from the buffer zone for "peacefully filming the courthouse's exterior from across the street." [Doc. No. 68-1 at 4; Doc. No. 69-3 at ¶¶ 11, 13]. Mr. Derosier did not violate the Buffer Zone Orders.

Similarly, Mr. Grant was prohibited from standing across the street from the Norfolk Superior Courthouse with an American flag and "holding a blue sign with a Biblical passage while on the side of the Registry of Deeds Building." [Doc. No. 69-3 at ¶ 15]. Mr. Grant's conduct did not violate the Buffer Zone Orders.

Finally, Ms. Walsh was arrested and criminally charged for wearing a black sweatshirt with the words "Criminals Control Norfolk County" and a hat labeled "FKR" inside the buffer zone. [Doc. No. 67-3 at 4]. Accompanied by a camera crew, Ms. Walsh initially sat on a cement slab that separates the front lawn of the Registry of Deeds and the sidewalk in front of Norfolk Superior Court. [*Id.*]. Subsequently, Ms. Walsh and her camera crew walked southbound on the sidewalk of High Street, where they were met by police. [*Id.*]. Ms. Walsh was then arrested. [*Id.*]. General messages commenting or criticizing "the system" whether that is the courts, the

prosecuting agencies, or law enforcement agencies, do not constitute an intent to interfere with the administration of justice or an intent to influence a judge, juror, witness, or court officer. Such messages criticize or call for change without referencing the outcome of the trial. Therefore, the display of "Criminals Control Norfolk County" is constitutionally protected speech.[9] However, the display of "FKR" which is readily understood to mean "Free Karen Read" is not protected in this context. FKR is a direct message about the Defendant's guilt or innocence, impermissibly suggesting to jurors what verdict is expected or appropriate.[10]

Also unprotected, and therefore impermissible, are direct messages that convey threats, fear, or pressure;[11] or implied threats, fear or pressure to conform to public opinion;[12] personal appeals to jurors;[13] legal claims,[14] or statements that directly target trial participants or the integrity of the trial.[15]

---

[9] Other examples of protected speech would include forms of the following: "We demand justice in the courts;" "Fair trials, fair system;" "Accountability of the courts;" and "Reform criminal justice system."

Also permissible are signage or messages that defend a protest's legitimacy without focusing on the trial or its participants. For example, the following would be such protected speech: "The right to protest is sacred;" and "Dissent is patriotic."

[10] Of course, "Convict Karen Read" would also be an impermissible message.

[11] Examples of direct messages that convey threats, fear, or pressure include but are not limited to the following: "Convict or face consequences;" "No justice, no peace – you've been warned;" or "We know where you live."

[12] Examples of implied threats, fear, or pressure to conform to public opinion include but are not limited to the following: "The community is watching;" "Do the right thing;" or "Imagine if defendant/victim were your family."

[13] Examples of personal appeals to jurors include but are not limited to the following: "Jurors, your conscience matters" or "Remember the victim's family."

[14] Examples of legal claims include but are not limited to the following: "The law requires a guilty verdict in this case;" or "Can't convict, no evidence."

[15] Examples of statements that directly target trial participants or the integrity of the trial include but are not limited to the following: "Judge Cannone is corrupt;" or "Bev's Court is a Clownshow."

ADD018

Taken together, Plaintiffs have shown a likelihood of success on their claim that the Buffer Zone Orders as applied deprived the protestors of their right to conduct constitutionally protected speech activities. *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) (cleaned up) (As applied and facial challenges should not be treated differently when it comes to "the substantive rule of law necessary to establish a constitutional violation," rather, "classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding 'breadth of the remedy.'").

**B.  Irreparable Harm**

"There is no need for an extensive analysis of [the irreparable harm] element of the preliminary injunction inquiry." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 15 (1st Cir. 2012). Here, Plaintiffs have shown they are likely to succeed in their as applied First Amendment discrimination claim. Because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," Plaintiffs have shown they are likely to suffer irreparable harm. *Roman Cath. Diocese of Brooklyn v. Cuomo,* 592 U.S. 14, 19, (2020) (citing *Elrod v. Burns*, 427 U.S. 347, 373, (1976) (plurality opinion)).

**C.  Balance Of The Equities And Public Interest**

"A plaintiff seeking a preliminary injunction must establish . . . that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The crux of the balance of equities inquiry is whether "the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Systems, Inc. v. C L Systems, Inc.* 640 F.2d 109, 113 (8th Cir. 1981). "Before issuing a stay, '[i]t is ultimately necessary … to balance the equities—to explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Trump v. Int'l Refugee Assistance Project,* 582 U.S. 571, 580 (2017) (citing *Barnes v. E-Systems, Inc.*

**ADD019**

*Group Hosp. Med. & Surgical Ins. Plan,* 501 U.S. 1301, 1305 (1991). A court is not required to grant total relief, "but may mold its decree to meet the exigencies of the particular case." *Id.* When the Government is the opposing party, as here, the balance of the equities and public interest analyses merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, Plaintiffs have shown a "likelihood of success on the merits," which "is a strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Furthermore, "[t]o deprive plaintiffs of the right to speak will therefore have the concomitant effect of depriving 'the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration.'" *Fortuno*, 699 F.3d at 15 (cleaned up). Where "[t]he only consequence of this injunction will be that [] persons who were unlawfully prevented from engaging in political speech will now be able to engage in such speech," the balance of the equities tips in favor of Plaintiffs and an injunction is in the public interest. *Id*. at 16.

## V.    CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, [Doc. No. 2], is <u>DENIED</u> in part and <u>GRANTED</u> in part. Law enforcement officers are enjoined from enforcing the Buffer Zone Orders in ways that are inconsistent with this decision. Prior to enforcement, law enforcement officers must be able to clearly articulate, without speculation, how any individual violated the Buffer Zone Orders, consistent with this decision.

SO ORDERED.

/s/ Myong J. Joun
United States District Judge

**ADD020**

## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JASON GRANT, ALLISON TAGGART, LISA PETERSON, and SAMANTHA LYONS,<br><br>                    Plaintiffs,<br><br>        v.<br><br>TRIAL COURT OF THE COMMONWEALTH OF MASSACHUSETTS, BEVERLY J. CANNONE, in her official capacity as Justice of the Superior Court, GEOFFREY NOBLE, as Superintendent of the Massachusetts State Police; MICHAEL d'ENTREMONT, in his official capacity as Chief of the Police Department of the Town of Dedham, Massachusetts, and MICHAEL W. MORRISSEY, in his official capacity as the Norfolk County District Attorney,<br><br>                    Defendants. | Civil Action No. 1:25-cv-10770-MJJ |

### <u>NOTICE OF APPEAL</u>

Plaintiffs, Jason Grant, Allison Taggart, Lisa Peterson, and Samantha Lyons ("Plaintiffs"), hereby give notice that they appeal to the United States Court of Appeals for the First Circuit from the Order (ECF No. 76) dated May 28, 2025, to the extent it denied Plaintiff's motion for preliminary injunction.

Dated: June 6, 2025.                                  Respectfully Submitted,

/s/ Marc J. Randazza
Marc J. Randazza, BBO# 651477
mjr@randazza.com, ecf@randazza.com
Jay M. Wolman, BBO# 666053
jmw@randazza.com
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (978) 801-1776

Mark. Trammell
(*Pro Hac Vice*)
Center for American Liberty
P.O. Box 200942
Pittsburgh, PA 15251
Tel: (703) 687-6200
MTrammell@libertyCenter.org

*Attorneys for Plaintiffs.*

**ADD021**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 6, 2025 the foregoing document was served on all parties or

their counsel of record through the CM/ECF system.

/s/ Marc J. Randazza
Marc J. Randazza

ADD022